UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

AUTO OWNERS INSURANCE COMPANY,

    Plaintiff,

        v.

JOHN HAGLER, SUE HAGLER and RON
MCCULLEY d/b/a Ron's Mobile Home Service,

    Defendants.

Case No. 13-cv-884-JPG-PMF

**MEMORANDUM AND ORDER**

This matter comes before the Court on plaintiff Auto Owners Insurance Company's ("Auto Owners") motion for summary judgment (Doc. 27), to which defendants John Hagler and Sue Hagler (collectively, "the Haglers") have responded (Doc. 41). The Court also considers Auto Owners' motion for default judgment against defendant Ron McCulley (Doc. 38).

**I.    Summary Judgment Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

**II.    Facts**

All parties who have appeared agree to the relevant facts in this case.

Auto Owners issued an insurance policy number 044604-07112896-04 to McCulley to insure his mobile home installation business. The policy covered the period from June 9, 2004, to

June 9, 2005 ("04-05 Policy") and included commercial general liability ("CGL") coverage, products completed operation hazard ("PCOH") coverage, and builder's risk coverage. Auto Owners also issued McCulley insurance policy number 054604-07009886-05 for the period from September 21, 2005, to September 21, 2006 ("05-06 Policy"). That policy included CGL coverage and PCOH coverage. Because the policies appear to be similar in the material respects, the Court may refer to them collectively on occasion using the singular term, "the Policy."

The dispute at the center of this case arose after the Haglers purchased a modular home from Altamont Manufactured Homes LLC ("Altamont") in April 2004. As part of the purchase agreement, Altamont was responsible for delivering and setting up the home. It hired McCulley to install the parts of the modular home at the home site into one home. McCulley installed the component parts of the home, and the Haglers moved into the home in September 2004. At some point, the home developed various problems such as sagging floors, cracks in the walls, bowing walls and separation of cabinets and the fireplace from the walls to which they were attached. The Haglers believed these problems were due to McCulley's failure to install the home in a workmanlike manner. In July 2006, they filed suit in the Circuit Court for the Third Judicial Circuit, Bond County, Illinois, against McCulley and others, alleging that McCulley breached the installation contract and violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. *See Hagler v. McCulley*, No. 06-L-9. The Haglers amended their complaint in the underlying action several times, finally settling on the Fourth Amended Complaint. That pleading asserts against McCulley only a cause of action for negligence. McCulley tendered its defense to Auto Owners, which is defending him under a reservation of rights.

In the case currently before this Court, Auto Owners seeks a declaration that it owes McCulley neither a defense nor indemnification in the underlying action. Auto Owners believes

the Policy does not cover the Haglers' underlying suit because the damage to the Haglers' modular home did not qualify as an "occurrence" or as "property damage" as defined in the Policy. It further argues coverage is excluded by the "your product/your work" and "impaired property" exclusions and that the loss is not covered by the "products completed operations hazard" coverage or "builder's risk" coverage. The Haglers maintain the Policy covers the damage to their home allegedly caused by McCulley's negligence.

The Court will address each of Auto Owners' arguments in turn to resolve this case.

**III.    Analysis**

When the Court exercises diversity jurisdiction, as it is doing in this case, it must apply state substantive law and federal procedural law. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)). When applying state substantive law, the Court must apply the law as it believes the highest court of the state would apply it if it were hearing the issues. *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001). When the highest state court has not spoken on an issue, the federal court must give great weight to decisions of intermediate appellate courts unless there are persuasive reasons to believe the highest court would rule differently. *Id.*

Under Illinois law, which all parties agree applies to this action, an insurer has an obligation to defend its insured in an underlying lawsuit if the complaint in the underlying lawsuit alleges facts potentially within the coverage of the insurance policy, even if the allegations end up being groundless, false or fraudulent. *General Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005). To determine if the underlying suit alleges a situation potentially within the insurance coverage, the Court compares the complaint to the relevant provisions of the insurance policy. *Id.* If any theory of recovery in the underlying complaint falls within the insurance coverage, the insurer will have a duty to defend. *Id.*

The underlying complaint in this case alleges McCulley was negligent when he transported, delivered, assembled, constructed and installed the modular home the Haglers had purchased from Altamont. Specifically, the Haglers allege McCulley slid the home onto its foundation without using the proper equipment, failed to use the appropriate support mechanisms to support the home, failed to property attach the home to the support mechanisms, and damaged the roof and wiring. As a consequence, the home has settled and sagged, causing components of the home to become insecure and/or to malfunction, and the Haglers will be forced to expend over $110,000 to repair the home.

The critical question in this case is whether the allegations in the underlying lawsuit fall within the Policy's coverage, which requires interpreting the Policy. Under Illinois law, interpretation of an insurance policy, even an ambiguous policy, is a matter of law. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1077 (Ill. 1993); *River v. Commercial Life Ins. Co.*, 160 F.3d 1164, 1169 (7th Cir. 1998). In interpreting a policy, the Court must attempt to effectuate the parties' intention as expressed by the policy. *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006). If the policy is unambiguous, the Court must construe it according to the plain and ordinary meaning of its terms. *Id.* On the other hand, if the policy is ambiguous, the Court must construe all ambiguities in favor of the insured and against the insurer, who drafted the policy. *Id.* In making the comparison, the Court must give the policy and the complaint a liberal construction in favor of the insured. *Country Mut. Ins. Co. v. Carr*, 867 N.E.2d 1157, 1160 (Ill. App. Ct. 2007). Generally, the insured bears the burden of proving the claim is covered under a policy's grant of coverage, and the insurer bears the burden of proving an exclusion applies. *Addison Ins. Co. v. Fay*, 905 N.E.2d 747, 752 (Ill. 2009).

Before turning to the question of whether the underlying complaint alleges a situation potentially covered by the Policy's grant of coverage and/or excluded by the Policy's exclusions,

the Court finds it helpful to take a closer look at what is involved in installing a modular home. First of all, modular homes are long-term residences that are built in a factory almost to completion using the same building materials used in conventionally built houses. National Modular Housing Council, *Modular Home*, http://www.modularcouncil.org/mc/mod_home.asp (last visited May 8, 2015); National Modular Housing Council, *The Modular Advantage: Understanding Today's Modular Home* 2, http://www.modularcouncil.org/mc/ (follow "Understanding Today's Modular Home" hyperlink) (last visited May 8, 2015). They are assembled in component parts – rooms or groups of rooms – that are able to be transported over the road to the site where the home will be installed.

At the site, the modular home installer prepares the site for the installation by clearing obstructions, ensuring proper clearances, open ground spaces and terrain grade and prepares the foundation for the modular units to be set. National Modular Housing Council, *Builder's Guide to Modular Home Set-Up & Completion* 2-3, www.modularcouncil.org/mc/admin/template/brochures/70temp.pdf (last visited May 8, 2015). The installer then detaches a modular unit from the shipping mechanism, prepares the appropriate surface of the module – the marriage wall – for joining together with another module, lifts the unit onto the foundation, and then secures the unit to the foundation. *Id.* at 4. The process is then repeated for the other module(s) that will form the completed house, with the installer drawing each subsequent module to an earlier set one using a hand-operated cable winch puller – commonly called a come-along – before it is firmly set on the foundation. *Id.* at 4-5. The modules are then bolted together, and the roof is set, joined and finished with shingles and gable walls. *Id.* at 5. When all modules are set, the installer sheaths the entire house, secures the roof center beams, levels the floors, seals the marriage wall connections, and connects the plumbing and electrical systems of the modules. *Id.* 5-6; *see, e.g.,* Modular Home Installation video,

https://www.youtube.com/watch?v=o3u8kqTfYik (last visited May 6, 2015); Sneak Peek At How A Modular Home is Installed (New Jersey Modular Homes) video, https://www.youtube.com/watch?v=AKiLvLAXRWo (last visited May 5, 2015).

Much interior finishing such as hanging cabinets and installing fireplaces can occur at the factory. *See, e.g.*, Modular Direct, *Assembly Line Tour*, http://www.modulardirect.com/modular-home-pictures/Assembly-Line-Tour/ (last visited May 8, 2015). Further interior finishing by the installer is often limited to the marriage wall areas and involves completing the trim, drywall and floor finishing in that area. *See, e.g.,* ExpressModular.com, *Understanding the Process*, http://www.expressmodular.com/understand_process.php (follow "Finishing Your Home" hyperlink) (last visited May 8, 2015). Other installers perform more extensive interior finishing work that may include installing interior doors, cabinets or fireplaces. *See* National Modular Housing Council, *Builder's Guide to Modular Home Set-Up & Completion* 7-8, www.modularcouncil.org/mc/admin/template/brochures/70temp.pdf (last visited May 8, 2015); JB Custom Homes, *Modular Home Building*, http://www.jbcbuilding.com/custom-homes/modular-homes.html, (last visited May 8, 2015) ("Generally, the exterior and interior finishing material of the home is installed at the factory, though it doesn't have to be."). The Haglers' complaint in the underlying Bond County case does not specify the extent of McCulley's undertaking with respect to finishing the interior of their modular home.

With this background information in mind, the Court turns to the question of whether the Haglers' underlying complaint alleges a cause of action potentially covered by the Policy.

A. "Occurrence"

The Policy states that it "applies to . . . 'property damage' only if . . . the . . . 'property

6

damage' is caused by an 'occurrence' that takes place in the coverage territory; and . . . [that] occurs during the policy period." 04-05 CGL Policy at 1, § I, Cov. A, ¶ 1.b (Doc. 2-3 at 11); 05-06 CGL Policy at 1, § I, Cov. A, ¶ 1.b (Doc. 2-6 at 6). The Policy further defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." 04-05 CGL Policy at 13, § V, ¶ 9 (Doc. 2-3 at 23); 05-06 CGL Policy at 13, § V, ¶ 9 (Doc. 2-6 at 18). It does not, however, define "accident." Leaving the question of "property damage" for later discussion, the Court turns to whether there was an occurrence.

Auto Owners asserts that the complaint in the underlying lawsuit does not allege events that amount to an "occurrence." In support of this position, it points to Illinois cases holding that an "accident" means "an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflictive or unfortunate character." *Stoneridge Dev. Co. Inc. v. Essex Ins. Co.*, 888 N.E.2d 633, 650 (Ill. App. Ct. 2008) (internal citations and quotations omitted); *accord Nautilus Ins. Co. v. Board of Dir. of Regal Lofts Condo. Assoc.*, 764 F.3d 726, 731 (7th Cir. 2014); *see also State Farm Fire & Cas. Co. v. Tillerson*, 777 N.E.2d 986, 990 (Ill. App. Ct. 2002); *Monticello Ins. Co. v. Wil-Freds Constr., Inc.*, 661 N.E.2d 451, 455 (Ill. App. Ct. 2006). Those cases hold that the "natural and ordinary consequences of an act do not constitute an accident." *Stoneridge*, 888 N.E.2d at 651 (internal citations and quotations omitted); *accord Regal Lofts*, 764 F.3d at 731; *see also Tillerson*, 777 N.E.2d at 990; *Wil-Freds*, 661 N.E.2d at 455. Auto Owners argues that the damage to the Haglers' home was not caused by an occurrence because, if the Haglers' allegations in the underlying suit are true, the damage was the "natural and ordinary consequence" of McCulley's faulty workmanship, not the consequence of an unforeseen, sudden or unexpected event.

In response, the Haglers posit that an "accident" can be construed to mean any result that

was not intended or expected by the person performing the acts. *Country Mutual Ins. Co. v. Carr*, 867 N.E.2d 1157, 1162 (Ill. App. Ct. 2007). The Haglers argue that since this meaning of "accident" is reasonable, the term is ambiguous and must be construed in their favor. Since no evidence suggests McCulley intended to cause damage to the Haglers' home, the damage must be viewed as having resulted from an accident, and the Policy must cover the damage.

The Court is in a quandary. As set forth above, Illinois Supreme Court law regarding insurance contract interpretation says that policies must, if possible, be construed in favor of the insured. *Carr* is consistent with this principle. Surely, it is reasonable to construe the term "accident" to include any consequence not intended, even if the conduct bringing about that consequence was clearly intended or if the damage was to the insured's own work or product. In fact, Merriam-Webster's on-line dictionary includes in its definition of "accident" "an unfortunate event resulting especially from carelessness or ignorance." "Accident," *Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/dictionary/accident (last visited May 2, 2015). Nothing in the Policy's definition of "occurrence" forecloses such an interpretation. And this interpretation has a certain appeal because it gives meaning to the "your work/your product" exclusion aimed at removing from coverage the insured's own product or work. Such an exclusion would be superfluous if such damage were not within the grant of coverage in the first place. There is no suggestion McCulley intended to damage the modular home – if he had, coverage would likely be excluded under the intentional damage exclusion – so under this construction of the Policy, an "occurrence" has happened.

On the other hand, there are numerous Illinois Appellate Court decisions like *Stoneridge*, along with a handful of Seventh Circuit Court of Appeals cases like *Regal Lofts*, giving "accident" a less expansive meaning under Illinois law. Indeed, the Court of Appeals recently noted that the definition of "accident" set forth in *Stoneridge* is almost uniformly accepted by Illinois courts, and

8

*Carr* appears to be an outlier where the damage alleged is to the builder's work. *Regal Lofts*, 764 F.3d at 732, n. 1. Those cases reason that it is no accident that shoddy workmanship leads to a shoddy end result, and that CGL policies are intended to cover injuries to others or others' property, not to repair an insured's own defective work.[1]

So it looks at first blush like the Court is left to choose between interpretive principles clearly announced by the Illinois Supreme Court and the vast majority of Illinois Appellate Court cases that give greater weight to policy questions than text-based interpretive rules. However, the choice is not actually so stark in light of an exception to the Illinois Appellate Court's interpretation of "accident." The cases cited by Auto Owners all involve a builder's failure to build a structure properly and the subsequent failure of the structure itself without any damage to other property. Those cases uniformly hold that the failure of the structure is not an accident – or an occurrence – because it is the natural and ordinary consequence of the builder's faulty workmanship. Thus, it is clear that, had this been a case about McCulley's failure to build a home in a workmanlike manner, damage to the home itself would not have been the result of an occurrence and would not be covered by the Policy. However, this case appears to fall into an exception, recognized by *Stoneridge*, for damage to third parties' property: "Still, construction defects that damage something other than the project itself will constitute an 'occurrence.'" *Stoneridge*, 888 N.E.2d at 655. .

The Haglers' underlying complaint may allege damage to their property not within the

---

[1] This approach could be reconciled with the Illinois Supreme Court's direction to construe ambiguous terms in favor of the insured by finding that the terms "occurrence" or "accident" as used in the insurance industry have an established, unambiguous meaning that does not include an insured's own faulty workmanship. This seems unlikely, however, in view of cases like *Carr* and cases from other jurisdictions that find faulty workmanship can constitute an occurrence. *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W. 3d 1 (Tex. 2007); *United States Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871 (Fla. 2007); *see also* 4 *Burner & O'Connor Construction Law* § 11:76 (noting developing trend of allowing faulty workmanship to constitute an occurrence).

9

scope of McCulley's work. McCulley was not hired to build the Haglers' home but simply to install it. The scope of that installation work, which is not described in the Haglers' underlying complaint, could have been very limited and could very well not have had anything to do with the placement or integrity of the cabinets or fireplace, which at all times belonged to the Haglers, not McCulley. It is clear that McCulley never owned the home in question, and it is possible that his work did not extend to some of the home components the Haglers claim were damaged by his negligent work. Therefore, it is reasonable to find that McCulley's alleged negligent performance of his work caused someone else's property to be damaged and that the damage could potentially have been caused by an accident, or an "occurrence," under Illinois law.

The Court now turns to the similar question of whether McCulley's alleged negligence caused "property damage," another requirement for the grant of coverage.

B. "Property Damage"

Each policy states that Auto Owners "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." 04-05 CGL Policy at 1, § I, Cov. A, ¶ 1.a (Doc. 2-3 at 11); 05-06 CGL Policy at 1, § I, Cov. A, ¶ 1.a (Doc. 2-6 at 6). The Policy further defined "property damage" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

04-05 CGL Policy at 13-14, § V, ¶ 12 (Doc. 2-3 at 23-24); 05-06 CGL Policy at 13-14, § V, ¶ 12 (Doc. 2-6 at 18-19).

Auto Owners argues that the Haglers simply seek repair and replacement of a "damaged product" McCulley provided, not for damage to other property. Thus, Auto Owners argues, they

are seeking recovery of only economic damages, not the tort damages CGL policies are designed to cover. *See Stoneridge Dev. Co. Inc. v. Essex Ins. Co.*, 888 N.E.2d 633, 652-53 (Ill. App. Ct. 2008). In response, the Haglers point out that the modular home was not built, created or owned by McCulley. Consequently, McCulley's negligence caused damage to tangible property belonging to and made by someone other than himself, precisely the kind of damage CGL policies are intended to cover.[2]

The Illinois Supreme Court examined the issue of "property damage" insurance coverage in *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481 (Ill. 2001). In that case, the insured had installed in a number of homes plumbing components that were prone to leaking. The relevant insurance policies covered "physical damage to tangible property," like the insurance policy in this case. The insurer claimed it was not liable for the diminution in the value of homes where the questionable plumbing had been installed but where it had not yet leaked and damaged other parts of the home. The Illinois Supreme Court found the phrase "physical injury to tangible property" clearly and unambiguously "requires that there be an injury to tangible property and that the injury be physical in nature." *Id.* at 496. Just as clearly, physical injury occurs "if the property is altered in appearance, shape, color or in other material dimensions" but not when it simply suffers a diminution in value unaccompanied by physical damage. *Id.* The Court concluded that homes where the pipes had not yet leaked did not suffer "physical injury to tangible property" and were not therefore within the policy coverage. *Id.* at 502.

---

[2] The "property damage" question presents the same interpretation problem noted in connection with the "occurrence" question. Construing the Policy in favor of the insured, it is reasonable to conclude that the modular home suffered "property damage" regardless of who owned the home at the time. The plain language of the Policy's grant of coverage does not require the property to belong to someone other than the insured; the Policy's exclusions are designed to address this sort of ordinary business risk. However, even if the Policy were to require property damage to someone other than the insured, as noted below, that requirement was satisfied because of the alleged physical injury to the Haglers' home.

As noted above, in the case underlying this instant lawsuit, the Haglers allege that McCulley's work caused their home to sag and caused several components which might not have been within the scope of McCulley's work to come apart or be deformed.  These are allegations of an alteration in appearance and shape of the Haglers' property, which the *Eljer* court has determined sufficiently allege "physical injury to tangible property."  The Haglers are not simply suing for economic damages because McCulley did not perform as he promised or because their house is no longer worth what it would have been worth had it been properly installed (although they are asking for that too).  They are suing because they believe McCulley physically damaged their home by his substandard work, that is, property damage to their home.  Thus, Auto Owners is not entitled to a declaration of non-coverage based on the lack of property damage.

Having found the Policy's grant of coverage extends to the Haglers' underlying suit and damages, the Court now turns to whether exclusions in the Policy negate that coverage.

      C.    <u>"Your Product" Exclusion</u>

The Policy excludes from coverage property damage "to 'your product' arising out of it or any part of it."  04-05 CGL Policy at 4, § I, Cov. A, ¶ 2.k (Doc. 2-3 at 14); 05-06 CGL Policy at 4, § I, Cov. A, ¶ 2.k (Doc. 2-6 at 9).  In turn, the Policy defines "your product" to mean:

> a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
>
> > (1) You;
> > (2) Others trading under your name; or
> > (3) A person or organization whose business or assets you have acquired;
>
> and
>
> b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

04-05 CGL Policy at 14, § V, ¶ 14 (Doc. 2-3 at 24); 05-06 CGL Policy at 14, § V, ¶ 14 (Doc. 2-6 at 19).

Auto Owners argues that this exclusion applies to negate any otherwise available coverage under the Policy. The Haglers do not respond to this argument. Nevertheless, the Court finds it has no merit. The Policy defines a "your product" as "goods or products," but McCulley provides services – modular home installation services – not goods or products. This exclusion does not apply.

D.   "Your Work" Exclusion

The Policy excludes from coverage property damage "to 'your work' arising out of it or any part of it and including [sic] in the 'products-completed operations hazard.'" 04-05 CGL Policy at 4, § I, Cov. A, ¶ 2.*l* (Doc. 2-3 at 14); *see* 05-06 CGL Policy, Exclusion-Completed Operations-Property Damage To Your Work Endorsement at 1 (Doc. 2-7 at 17) (correcting grammatical error in statement of exclusion in main policy). In turn, the Policy defines "your work" to mean "a. Work or operations performed by you or on your behalf; and b. Materials, parts or equipment furnished in connection with such work or operations." 04-05 CGL Policy at 14, § V, ¶ 15 (Doc. 2-3 at 24); 05-06 CGL Policy at 14, § V, ¶ 15 (Doc. 2-6 at 19).

The rationale for this exclusion, and other business risk exclusions, is that CGL insurance policies are "intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses." *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 503 (Ill. 2001) (internal quotations and citations omitted); *accord United States Fid. & Guar. Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 934 (Ill. 1991) (insured's own faulty workmanship is a "normal risk[] associated with the conduct of the insured's business").

Auto Owners argues that any damage McCulley's alleged negligence caused was to his work, that is, the modular home he was hired to install, and is therefore excluded under the "your

work" exclusions. The Haglers argue that the entire modular home is not within the scope of McCulley's work, which involved only assembling prefabricated parts.

The Court agrees with the Haglers that their underlying complaint alleges damages that may be beyond McCulley's work, which may not have included interior finish work on the prefabricated modular home components. While the "your work" exclusion would exclude liability coverage for McCulley's faulty work like, for example, the costs to reinstall the modular home or to replace the materials McCulley used in the installation process, it would not exclude coverage for damage to parts of the modular home that were not part of McCulley's installation work like, for example, the cabinets and the fireplace that have pulled away from the walls to which they were attached. Where the exact line is between McCulley's work and the Haglers' property damage is not clear, but that question is not before the Court today. The Court only finds that there is property damage to something that is not McCulley's work, so the "your work" exclusion does not negate the duty to defend and possibly to indemnify for *some* damages should McCulley ultimately be found liable.

      E.      "Impaired Property" Exclusion

The Policy excludes from coverage damages claimed for "any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of . . . 'impaired property'; if such . . . property is withdrawn or recalled . . . from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it." 04-05 CGL Policy at 4, § I, Cov. A, ¶ 2.n (Doc. 2-3 at 14); 05-06 CGL Policy at 4, § I, Cov. A, ¶ 2.n (Doc. 2-6 at 9). In turn, the Policy defined "impaired property" to mean:

> tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

>a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
>b. You have failed to fulfill the terms of a contract or agreement;
>
>if such property can be restored to use by:
>
>a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
>
>b. Your fulfilling the terms of the contract or agreement.

04-05 CGL Policy at 11, § V, ¶ 5 (Doc. 2-3 at 21); 05-06 CGL Policy at 11, § V, ¶ 5 (Doc. 2-6 at 16).

While Auto Owners cites this exclusion in its motion and quotes extensively from *State Farm Fire & Cas. Co. v. Tillerson*, 777 N.E.2d 986 (Ill. App. Ct. 2002), in support of its argument that this exclusion applies, it provides no analysis whatsoever about how this exclusion applies to the case at bar. It is not the Court's job to formulate arguments for litigants, *United States v. McClellan*, 165 F.3d 535, 550 (7th Cir 1999), especially those represented by able counsel. By failing to support its position with relevant argument, Auto Owners has failed to establish it is entitled to judgment as a matter of law as to the application of this exclusion.

  F. <u>Products Completed Operations Hazard Coverage</u>

The Policy provides "products completed operations hazard" ("PCOH") coverage. The Policy further defines PCOH to include "all . . . 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except: (1) Products that are still in your physical possession; or (2) Work that has not yet been completed or abandoned." 04-05 CGL Policy at 13, § V, ¶ 11.a (Doc. 2-3 at 23); 05-06 CGL Policy at 13, § V, ¶ 11.a (Doc. 2-6 at 18).

Auto Owners argues that the damage caused by McCulley's allegedly negligent work did not *arise out of* his work, as required by the PCOH coverage, but instead *was* his work. *See State*

15

*Farm Fire & Cas. Co. v. Tillerson*, 777 N.E.2d 986, 993 (Ill. App. Ct. 2002) (PCOH coverage did not include damage to the construction built by the insured contractor where no damage to other property was alleged). The Haglers do not respond to this argument, but the Court finds nonetheless that Auto Owners position is without merit. As explained above, the Haglers are suing McCulley in the underlying suit for damage to his own work, which would not fall under the PCOH coverage, as well as damage to parts of the Haglers' home that was not within McCulley's scope of work, which would fall under the PCOH coverage. Therefore, Auto Owners has not established its entitlement to a declaration that the PCOH coverage does not apply.

    G.    <u>Builder's Risk Coverage</u>

Auto Owners also provides "builder's risk" coverage in the 04-05 Policy that covers property "owned by you or which is in your care, custody or control," including, among other things, (1) structures and fixtures in the course of construction and (2) building materials, while on the job site that will become part of the structure. 04-05 Policy, Builder's Risk/Installation Floater Form at 1 (Doc. 2-4 at 14). The builder's risk form also provides:

> Except as to ensuing loss or damage not otherwise excluded, we do not cover loss or damage resulting directly or indirectly from . . . [f]aulty, inadequate or defective: (1) construction, reconstruction, repair, remodeling or renovation; (2) materials used in construction, reconstruction, repair, remodeling or renovation; [or] (3) design, workmanship, specifications . . . of a part or all of any property.

04-05 Policy, Builder's Risk/Installation Floater Form at 2-3 (Doc. 2-4 at 15-16).

Auto Owners argues that it is clear from the Haglers' underlying complaint that their damages arose after McCulley had finished his work on the modular home and they had taken control of the premises, so the home was no longer in the course of construction or in McCulley's care, custody or control. To the extent the complaint leaves open the possibility that some damage arose before McCulley completed his work, Auto Owners argues such damage is subject to exclusion for faulty construction or workmanship. The Haglers argue that the damages they

suffered were to building materials used in the installation that became permanent parts of the structure while the building materials were on the job site.

Reading the Haglers' complaint in the underlying case broadly, as the Court must do, it is possible that some of the alleged damages could have occurred while damaged property was in McCulley's care, custody and control on the job site during the course of construction. The complaint alleges no dates or sequence of events where McCulley finished his work and then the Haglers' took possession of the modular home and then the injury occurred. However, the broad exclusion for direct or indirect damage from faulty construction or workmanship would preclude coverage under the builder's risk coverage for the damages the Haglers suffered. It is hard to construe their allegations of harm to be anything other than "damage resulting directly or indirectly from . . . faulty, inadequate or defective . . . construction . . . [or] workmanship." 04-05 Policy, Builder's Risk/Installation Floater Form at 2-3 (Doc. 2-4 at 15-16). Auto Owners is entitled to summary judgment on this limited issue.

## IV.     Conclusion

Auto Owners has not established it is entitled to judgment as a matter of law for any of its claims except the claim for non-coverage under the builder's risk coverage. Accordingly, the Court **GRANTS in part** and **DENIES in part** Auto Owners' motion for summary judgment against the Haglers (Doc. 27) and motion for default judgment against McCulley (Doc. 38). The Court **GRANTS** the motions to the extent they seek a declaration of non-coverage under the builder's risk coverage of the 04-05 Policy and **DIRECTS** the Clerk of Court to enter judgment declaring the following at the close of the case:

> Plaintiff Auto Owners Insurance Company owes defendant Ron McCulley d/b/a Ron's Mobile Home Service no duty under the builder's risk coverage issued in conjunction with insurance policy number 044604-07112896-04 to defend or indemnify defendant McCulley in *Hagler v. McCulley*, No. 06-L-9, in the Circuit

      Court for the Third Judicial Circuit, Bond County, Illinois.

The Court **DENIES** the motions in all other respects.

**IT IS SO ORDERED.**
**DATED: June 22, 2015**

                                            s/ J. Phil Gilbert
                                            **J. PHIL GILBERT**
                                            **DISTRICT JUDGE**